## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES E. SHELTON, individually and on behalf of all others similarly situated, | Case No. 24-4679 |
| | **JURY TRIAL DEMANDED** |
| Plaintiff, | |
| v. | |
| COMMITTEE FOR POLICE OFFICERS DEFENSE PAC | |
| Defendant. | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

### I.    INTRODUCTION

Attempts by the robocalling industry to blame the victims of their calls are nothing new. Trial and appellate courts have had little trouble rejecting such smear tactics.

But now, it has come to this.

In its brief (ECF. No. 21) ("Motion" or "Br."), the Defendant, a Political Action Committee that claims to help police officers, but which in reality simply spends a majority of its money on its own illegal prerecorded calling here, accuses the Plaintiff, a consumer advocate with a track record of holding those who call him illegally accountable for their actions, of being a "professional plaintiff" who lacks standing to assert the claims here. The audacity of Defendant's baseless assertions and blatant case of the pot calling the kettle black has a boring ending: denial, because the assumptions and arguments on which the motion are premised are utterly false. The "abuse" here is Defendant's illegal robocalling to line its own pockets under

1

the guise of helping law enforcement—not Plaintiff's suing to try to put an end to it.

What does Defendant mean by "professional plaintiff" and maker of "frivolous and manufactured lawsuits?" As the ensuing motion makes clear, the Defendant insinuates that Mr. Shelton somehow invites the calls and lacks standing because he engages in investigative activity in his cases to uncover those who called him illegally. In so doing, Defendant ignores that they called Mr. Shelton's number, on the National Do Not Call Registry, with prerecorded robocalls, in violation of federal law. Far from a "serial plaintiff" and far from this case being "frivolous," Mr. Shelton is the exact type of individual Congress intended to protect, and, in fact, incentivize, when they passed the Telephone Consumer Protection Act of 1991, as this very Court has held.

Relatedly, the Defendant's claims that the Plaintiff's demands for injunctive relief and treble damages should be stricken turn a blind eye to the obvious: that the Defendant not only knowingly made calls with prerecorded voices, and the Defendant's explicit pleading of a loophole it intends to use going forward. In the absence of powerful treble damages and injunctive relief, as explicitly provided under the TCPA, the Defendant will exploit the loophole it identifies in its motion to continue to send prerecorded robocalls to the cell phones of those who do not want them with potential immunity.

"Buried beneath the mummeries and straining-to-be-memorable passages"[1] of the Defendant's motion, there lies a boring ending and resolution: denial. The proper resolution of Defendant's motion requires the Court to permit this case to proceed to discovery to test the claims the Plaintiff makes out, not strike them, and the Plaintiff's standing to pursue them for the benefit of a class of others similarly situated, at the pleadings stage. The motion to dismiss is based on falsehoods that minimize the Plaintiff's advocacy while maximizing assumptions based

---

[1] *Obergefell v. Hodges*, 576 U.S. 644, 716 (2015) (Scalia, J., dissenting).

on utterly false premises. Defendant's motion should therefore be denied in its entirety.

## II.    FACTUAL BACKGROUND

The original complaint in this matter was filed in September, with Mr. Shelton seeking to represent himself and a class of other individuals similarly situated, based on the Defendant's highly illegal prerecorded calling campaign through which it called cell phones, like Mr. Shelton and other class members, in blatant contravention of the plain text of the TCPA. The complaint is clear that the call began with a prerecorded voice, and it is also clear that it broke the law. It is also no secret that Mr. Shelton has pursued numerous meritorious TCPA claims before this Court. Despite these facts, the Defendant has sought to dismiss this case and in so doing minimized its own illegal conduct. In sum, Defendant relies on two principal arguments for why the case should be dismissed under Rule 12(b)(1) and argues that the Plaintiff's claims for treble damages and injunctive relief should be dismissed under Rule 12(b)(6). This response follows.

## III.    LEGAL STANDARD

The standards for 12(b)(1) challenges for a lack of subject matter jurisdiction are well-settled in this circuit. Notably, there exist two types of 12(b)(1) challenges, each with their corresponding standards: facial and factual challenges. *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). Here, Defendant has submitted an affidavit and additional evidence in order to support its contention that the case should be dismissed. In so doing, Defendant mounts a factual challenge. In such a challenge, this Court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* "In evaluating whether a complaint adequately pleads the elements of standing, courts apply the standard of reviewing a complaint pursuant to a Rule 12(b)(6) motion to dismiss for failure to state a claim: Court[s] must accept as true all material allegations set forth in the complaint, and must construe those facts in favor of the nonmoving party." *Huertas v. Bayer US LLC*, 120 F.4th 1169, 1174

3

(3d Cir. 2024). Moreover, to the extent that the motion does not properly address jurisdiction but instead sounds in the factual merits of the Plaintiff's claims, such motion also ought to be denied and the case proceed. *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991).

Under Rule 12(b)(6), a court may dismiss a complaint that fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Rather than require detailed pleadings, the Rules demand only a "short and plain statement of the claim showing that the pleader is entitled to relief, in order to give defendant fair notice of what the claim is and the grounds upon which it rests." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (cleaned up). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).

In determining whether a claim is plausible, the court must "draw on its judicial experience and common sense." *Connelly*, 809 F.3d at 786–87. After identifying elements to set forth a claim and removing conclusory allegations, the Court must accept all well-pled factual allegations as true and determine if they give rise to relief. *Id.* A complaint may be dismissed only where it appears that there are not "enough facts to state a claim that is plausible on its face," not merely because the defendant proffers some contrary facts. *Twombly*, 550 U.S. at 570.

## IV.    ARGUMENT

A.    *Mr. Shelton's prior litigation history is irrelevant, and Defendant's characterizations of them are nevertheless false.*

Lamentably, in lieu of actually responding to the merits of the Plaintiff's claims in alleging that the Defendant uses illegal prerecorded robocalls to call cell phones to generate

4

funds for its Political Action Committee and fundraising efforts under the guise of helping law enforcement, Defendant spends over six pages of its motion outlining Mr. Shelton's irrelevant history of consumer advocacy and holding those who call him accountable under the TCPA, maligning it as "abusive and fraudulent litigation." (Br. at 2, citing no one). And though the pot calling the kettle black is a recurrent theme throughout the Defendant's motion, Defendant is unable to point to a *single case* where this Court, or any other court, has held that Mr. Shelton engaged in fraud, abusive litigation, or fraudulent litigation, as alleged. To the contrary, every court to consider the same has *held the opposite*. As Judge Kenney stated in response to a nearly identical argument that Mr. Shelton was somehow engaging in improper conduct by pursuing entities that call him illegally:

> I don't care how many cases he can file. He can file one thousand eight hundred and fifty cases. I'm going to handle each case on its merits. Every single case. But you have to understand something. You file a case in this courtroom you're going to be in this courtroom and you're going to litigate this courtroom. That's how this courtroom works. It doesn't work by paper. It doesn't work by somebody's company's business model. And that goes for law firms, it goes for any other claim. You're going to litigate a case in Philadelphia, you're going to come into the courtroom so I can see what I'm dealing with.

*Shelton v. Arete Fin. Grp.*, No. 2:18-cv-2187-CFK (Oral Arg. Tr. Dec. 14, 2018) (cleaned up).

   As Mr. Shelton's attached declaration makes clear, the Defendant's allegations about Mr. Shelton's business and litigation history are bizarre and utterly false. Final Verdict Solutions is not a "front for his TCPA scheme." (Shelton Dec. ¶ 9). To the contrary, it is a successful business that specializes in purchasing and collecting all types of court judgments. (*Id.* ¶ 8). *Shelton v. Target Advance LLC*, No. 18-2070, 2019 WL 1641353, at *5 (E.D. Pa. Apr. 16, 2019), the case upon which the Defendant relies for the proposition that Mr. Shelton's company is some unspecified "front" for TCPA operations, does not hold what the Defendant claims it does. In fact, the *Target Advance* court explicitly *rejected* the notion at summary judgment that the

Plaintiff lacked standing because of his previous litigation history and distinguished the case

from another in which a court held that a plaintiff did not have standing, noting that:

> Here, unlike in *Stoops*, Plaintiff's cellphone is for both personal and business use.
> However, based on Plaintiff's allegations, it appears that the calls at issue were directed
> and made to the business use of the cellphone, and not to his personal use. . . . As
> indicated, the *Stoops* court found that because the plaintiff had admitted that her only
> purpose in using her numerous cellphones was to file TCPA lawsuits, she had not suffered
> an injury-in-fact and was not in the zone of interests the TCPA was enacted to protect and,
> therefore, did not have standing. Here, the website for Plaintiff's business, Final Verdict
> Solutions, advertises as a professional judgment recovery business. . . . Defendant points
> to the many judgements Plaintiff claims to have obtained and argues that Plaintiff is
> misusing the TCPA by turning it into a profit generating scheme, as in *Stoops*. It is
> premature at this juncture to determine whether or not this contention is true.

*Id.* In *Target Advance*, Mr. Shelton sued Target Advance, a business loan company, for

calls made to his personal cell phone not at issue here, which he also used as a number for Final

Verdict Solutions as it was just starting out. The Court's holding in *Target Advance* was limited

to whether, during the time period at issue, the Plaintiff's telephone number was eligible for

inclusion on the National Do Not Call Registry, which is limited to residential numbers and

mixed-use numbers for residential purposes, noting that "it appears that the calls at issue were

directed and made to the business use of the cellphone, and not to his personal use." *Id.*

Defendant also fails to mention that the *Target Advance* court actually *permitted* the Plaintiff's

remaining claims, under the same statutory subsection alleged here, for calls using an ATDS to

his cell phone, to *proceed*. *Id.* at *6. In sum, all *Target Advance* stands for is the unremarkable

proposition that the Plaintiff could not sue for business-to-business Do Not Call list violations for

the time that Plaintiff's cell phone was used for business purposes. It is worth noting that,

subsequent to *Target Advance*, Plaintiff obtained a dedicated number for his business.

The purportedly "leaked" audio recordings of the Plaintiff fare no better, are hearsay,

irrelevant, unauthenticated, and hold no evidentiary value whatsoever. The transcript of a

conversation allegedly involving Shelton and an unrelated, unidentified third person not here, "M.O.," is factually and evidentiarily meaningless. Defendant contends that the "transcript" is some sort of evidence that Mr. Shelton lacks standing, but, even if true, all the transcript shows is that Mr. Shelton engages in an investigation to determine whether his claims are against viable defendants. It also bears noting that, as Defendant places in a footnote, Judge Wolson sanctioned the attorney for Jacovetti Law, Joshua Thomas, for his conduct in the litigation where the transcript first surfaced, which sanctions resulted in Mr. Thomas' suspension from the bar.

Even so, the Defendant is forced to admit that the "transcript" does not demonstrate any wrongdoing, let alone an intent to "cheat or defraud anyone," as Judge Wolson observed:

> The Amended Complaint also points to transcripts of conversations in which Mr. Shelton discussed his litigation strategy. Those conversations demonstrate that Mr. Shelton investigates potential defendants before he sues them to ensure they can satisfy a judgment. That pecuniary approach to litigation might be unseemly, as the Court has observed before. But it is not illegal. *Certainly, it does not demonstrate that Mr. Shelton intends to cheat or defraud anyone.* It only shows that he intends to collect if he prevails in litigation.

*Jacovetti L., P.C. v. Shelton*, No. 2:20-CV-00163-JDW, 2020 WL 5211034, at *3 (E.D. Pa. Sept. 1, 2020) (emphasis added). Conducting research into whether or not a potential tort defendant is ultimately going to be collectible, prior to deciding whether or not it is prudent to litigate meritorious claims against that tortfeasor, is not evidence of bad faith or maliciousness on the part of the plaintiff seeking to litigate the claims. Rather, it is a component of a sound strategy, shows proper allocation of resources, and concern for the court's time. It makes little sense to obtain a judgment against an entity that has no assets. Assuming Mr. Shelton researches whether or not a potential defendant is ultimately going to be collectible, as long as his claims have merit, those claims do not suddenly deprive Mr. Shelton of standing by mere virtue of the fact that Shelton asks himself, "If I am awarded a judgment, will I be able to collect on it?"

That a TCPA litigant such as Mr. Shelton might be motivated in part by a desire to not only obtain a judgment to vindicate his rights, but to ultimately be able to collect on the judgment and recover the money damages awarded to him, has no bearing on the underlying merit of his TCPA claims and it has no bearing on his standing as a litigant to proceed under the TCPA. "The TCPA does not merely contemplate self-interested plaintiffs—it encourages them." *Cunningham v. Rapid Response Monitoring Servs.*, 251 F. Supp. 3d 1187, 1197 (M.D. Tenn. 2017). Defendant seems to imagine a world where, in order to demonstrate an injury in fact and prove standing, a TCPA plaintiff must be an "exasperated consumer" expressing "concern or annoyance" and not "enjoy[] being called." (Br. at p. 4–5). Not so. As the Court in *Cunningham* went on to elucidate on the issue of standing in expressly rejecting that notion:

> The determinative issue, then, is not Cunningham's motivations, but whether he was injured. An ordinary consumer who pled the facts that Cunningham has pled would have established a concrete and particularized injury-in-fact based on the Defendants' intrusion upon his rights to privacy and seclusion. Defendants suggest that, by becoming a so-called "professional plaintiff," he has forfeited those rights because the calls alleged were not truly unwanted. Insofar as *Stoops* endorses such a result, this Court disagrees. *It may be that Cunningham was not saddened or annoyed by the calls he received; it may even be that, knowing his rights under the TCPA, he is glad the calls were placed.* But allowing that fact, even if true, to negate his right to privacy and seclusion would require the Court to embrace a line of reasoning that would ultimately undermine the rights of most, if not all, TCPA plaintiffs and plaintiffs in similar statutory schemes.

*Cunningham*, 251 F. Supp. 3d at 1196 (cleaned up) (emphasis added). Even so, Mr. Shelton does not enjoy or want the calls; to the contrary, he finds them annoying and wants them to stop. (Shelton Dec. ¶ 35–37). Nor does the Plaintiff "maintain a large and constantly changing reservoir of burner phones and burner phone numbers." (Br. at p. 4 n.1). As Mr. Shelton's declaration makes clear, only two of the numbers listed in that footnote belong to Mr. Shelton, one belongs to his business, and the others belong to various people, including his brother and parents. (Shelton Dec. ¶ 11). Defendant cannot point to a single lawsuit in which Mr. Shelton or anyone else sued for calls to any of these random other telephone numbers, because none exist.

Defendant's third attempt to attack Mr. Shelton's standing and the eminent propriety of bringing this suit as a class action fall flatter than its previous attempts. No part of the decision in *Shelton v. Comcast Corp.*, held that "Shelton devised a scheme to manufacture a class action which was barred by an arbitration agreement." (Br. at 7). No part of the opinion states that Mr. Shelton allegedly "manufactured" a class action, let alone that it was part of some "scheme" he devised. No. CV 20-1763, 2021 WL 214303 (E.D. Pa. Jan. 21, 2021). Nor did the Court hold that "Shelton devised a scheme to fraudulently induce Comcast into starting a new service at a fake address, solely so Shelton could again avail himself of an arbitration "opt out" opportunity." (Br. at 7, citing no one). Those holdings appear nowhere in the Court's opinion and only in Attorney Kane's bizarre and wild mischaracterization of Comcast's motion. To the contrary, Mr. Shelton played along with the caller to verify it was Comcast calling him illegally. (Shelton Dec. ¶ 32).

In *Comcast*, this Court held that Mr. Shelton was the "beneficiary" of an arbitration agreement entered into under Pennsylvania law between Comcast and his parents in 2006, when the Plaintiff was still a minor. *Id.* at *3. In compelling arbitration, and in applying the test under Pennsylvania law for whether a "non-signatory knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement," the Court held that, as an adult, Mr. Shelton "actively sought and obtained benefits provided pursuant to the Subscriber Agreement," and thus was "equitably estopped from avoiding the Arbitration Provision." *Id*. (citing the "exploitation" test articulated in E.*I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 199-200 (3d Cir. 2001)). It defies logic and common sense to argue that a person's good faith arguments for why they are not subject to an arbitration agreement somehow proves that they were involved in some unspecified "scheme" to "manufacture" a class action, let alone use a legal test's use of "exploit" in a different context.

Defendant's mischaracterizations of what happened in that case and its own allegations to the contrary are a peculiar attempt to relitigate a decided issue it had no stake in. Defendant may "believe" that the Plaintiff's actions in that case rose "to the level of fraud" and that the case was "illegitimate." (Br. at 7–8). But Comcast didn't argue that anything that Mr. Shelton did was fraudulent, and the Court made no such holding. *Comcast Corp.*, 2021 WL 214303. No part of the opinion addresses any fraudulent conduct on the part of Mr. Shelton, and its only uses of "fraud" involve quotes from the text of the arbitration provision. *Id.* at *2, *4. Similarly, the Court made no holding that Mr. Shelton's claims were at all illegitimate or that he somehow "exploited the legal system" (Br. at 8, again citing no one); all it decided was that Mr. Shelton agreed to an arbitration provision and had to pursue any claims against Comcast, including for calls to his cell phone, in arbitration as a non-signatory beneficiary. *Id.* at *5–*6.

Simply put, Defendant's contention that Mr. Shelton has a "well-documented history of depict [sic], and even fraud" (Br. at p. 8) is utterly false and unsupported by any decision holding the same. Nor are the cases that the Defendant cites for that proposition at all similar. In *Weisman*, for instance, the Court disqualified a class representative for adequacy because he was *convicted of securities fraud* in a suit alleging securities fraud. *Weisman v. Darneille*, 78 F.R.D. 669, 670–71 (S.D.N.Y. 1978). Mr. Shelton has not been convicted of a crime, let alone had any holding that he brought TCPA cases for improper purposes or otherwise lacked standing to assert the claims arising out of some alleged impropriety. (Shelton Dec. ¶ 25–26). This case is also nothing like *Ash v. Brunswick Corp.*, either, where the court held that proposed class counsel was inadequate when counsel for the plaintiff was an equity partner in the same law firm as the plaintiff himself. 405 F. Supp. 234, 248 (D. Del. 1975). That's completely irrelevant here, as Mr. Shelton is not part of a law firm, class counsel are not part of Mr. Shelton's business, nor have

counsel alleged that they received calls from the Defendant. In any event, counsel for Plaintiff are excluded from the putative class under the proposed definition in the complaint.

Simply put, there is nothing in Mr. Shelton's prior litigation history that supports the Defendant's perverse notion that his conduct in other unrelated cases has anything to do with his standing in this case. The Defendant mischaracterizes and misrepresents the facts, allegations, and holdings in Mr. Shelton's previous litigation. As has been described, and as will be explored below, every court to consider Mr. Shelton's previous litigation, including this one, has explicitly held the opposite: that Mr. Shelton unquestionably has standing and that nothing in his litigation history demonstrates anything at all improper. Defendant's motion should therefore fail.

B.    *As the attached transcript and call recording shows, Mr. Shelton received a call which began with a prerecorded voice. Even so, that's irrelevant to the statute here.*

The Plaintiff's complaint is clear: Mr. Shelton received an illegal call, which "began" with a "pre-recorded voice, possibly using an Artificial Intelligence (AI) robot or Mechanical Turk" saying, "Hi, Good Morning! This is Tom calling with the Committee for Police Officers Defense PAC." (Compl. ¶ 27). Nothing about that is "unclear" or "vague;" the Plaintiff's well-pled factual allegation is that the call "*began*" with "a pre-recorded voice." The Plaintiff also alleges that this robotic voice continued and did not respond to the Plaintiff saying "OK?;" Mr. Shelton also alleges that the recording simply continued, despite him talking over it. (Compl. ¶ 28–29). That conduct was plainly illegal under the express text of the statute, which prohibits "mak[ing] any call" "using an artificial or prerecorded voice" to any cell phone except with prior express written consent or emergency purposes. 47 U.S.C. § 227(b)(1)(A)(iii); *Perrong v. Victory Phones LLC*, No. CV 20-5317, 2021 WL 3007258, at *6 (E.D. Pa. July 15, 2021) ("[T]he operative language of the TCPA is unambiguous. Section 227(b)(1)(A) prohibits placing artificial and prerecorded voice calls to a variety of telephone numbers.").

The Plaintiff further pleads, in exacting detail, factual reasons for why the call was placed using a "prerecorded voice" and was not initiated by a human, not the least of which because "the Plaintiff was eventually transferred to a human being in order to complete the purchase." (Compl. ¶ 34). As at least one court has concluded, "That is good enough. Virtually everyone can quickly recognize when they are speaking with a non-human on the phone, and [plaintiff] has provided more than sufficient detail to persuade the Court that he is no outlier on that front. Federal notice-pleading standards do not require his complaint to provide microscopic analysis of these calls' qualities." *Katz v. CHW Grp., Inc.*, No. 5:22-CV-5198, 2023 WL 6445798, at *4 (W.D. Ark. Sept. 29, 2023). Even so, Plaintiff has done so here in "microscopic" detail.

Despite these facts, the Defendant seems to intimate that the Plaintiff first spoke to a human, then was transferred to a robot, and then back to a human. (Br. at p. 10). Not only is that untrue, as that contention is easily debunked by the authenticated recording and transcript of the same attached herein as Exhibit B, it defies logic and common sense for a human to call someone, transfer the call to a robot, and then transfer the call back to a human. Furthermore, even *if* that contention was true (which it most assuredly is not), it doesn't matter. The statutory provision at issue here prohibits "mak[ing] a call" "using . . . an artificial or prerecorded voice." 47 U.S.C. § 227(b)(1)(A). This is contrasted with a separate statutory provision, under which the Plaintiff does not sue, 47 U.S.C. § 227(b)(1)(B), which prohibits "initiat[ing] any telephone call to any residential telephone line using an artificial or prerecorded voice." Defendant points to an irrelevant red herring that the statute requires "initiation." That's factually and legally untrue.

As this Court observed in *Victory Phones*, the two portions of the statute, Subsection (b)(1)(*A*), and (b)(1)(*B*), are distinct provisions, and one cannot graft the requirements of one subsection onto the other. 2021 WL 3007258, at *7. "The surplusage canon holds that it is no

more the court's function to revise by subtraction than by addition." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012). The Defendant's attempt to read and graft the term "initiate" into subsection (b)(1)(A) violates this "presumption of consistent usage:" "Where the legislature has specifically used a word or term in certain places within a statute and excluded it in another place, the court should not read that term into the section from which it was excluded. A word or words appearing in one section of a statute cannot be transferred into another section." *Id.* at 124.

The authority cited by the Defendant does not hold otherwise or dictate a contrary conclusion that a call *to a cell phone* must *begin* with a prerecorded voice. Of course, the Plaintiff pleads that this was the case in any event. In fact, *Gager v. Dell Fin. Servs., LLC* actually supports the Plaintiff and rejected exactly what the Defendant attempts here in grafting exemptions for calls to landlines contained in subsection (b)(1)(B) to calls which violated subsection (b)(1)(A). There, the Third Circuit noted that an exemption on which Dell relied for calls that do not "*introduce* an unsolicited advertisement or constitute a telephone solicitation," "do not apply to cellular phones; rather, these exemptions apply only to autodialed calls made to land-lines." 727 F.3d 265, 273 (3d Cir. 2013). Similarly, the Ninth Circuit in *Moser* dealt with the "initiate" language in subsection (b)(1)(B) of the statute for calls to landlines, not the "make" language in subsection (b)(1)(A) for calls to cell phones. And *Ashland Hosp. Corp. v. Serv. Emps. Int'l Union, Dist. 1199 WV/KY/OH*, 708 F.3d 737, 741 (6th Cir. 2013) is completely off base. There, the Sixth Circuit held that a prerecorded voice was not used on calls at all when local residents were directly connected to the extension of a hospital executive to express displeasure as to hospital policy. As the Sixth Circuit neatly summarized, "If [the executive] had answered his telephone at any particular time over the relevant two-day period, he would have

heard a live voice on the other end, not a prerecorded message." *Id.* at 742.

What, then, does it mean to "initiate" a call, as opposed to "make" a call? As with any question of statutory interpretation, the court's inquiry "begins with the text." *Ross v. Blake*, 578 U.S. 632, 638 (2016). And, under the fixed-meaning canon, "[w]ords must be given the meaning they had when the text was adopted." Scalia & Garner 78. With respect to the TCPA, we consider the year 1934, when the Telecommunications Act of which the TCPA is a part was enacted. The meanings of "make" and "initiate" are different. Webster's in 1936 defined "make" as "To form or constitute in external nature; primarily, to fashion or construct; secondarily, to enter into as parts or elements." Webster's Collegiate Dictionary (1936). That is, to "make" a call "using" a prerecorded voice as prohibited under Section (b)(1)(A), the call need only have, as a "part or element," a prerecorded voice. By contrast, Webster's in 1936 defined "initiate" as "To introduce by a first act; originate; begin." *Id.* Thus, to "initiate" a call "using" a prerecorded voice as prohibited under Section (b)(1)(B), the call must have "originate[d]" or "beg[un]" with a prerecorded voice. Of course, as an initial matter, the Defendant's position is a red herring because the call began with a prerecorded voice. Even so, Defendant's arguments hold no weight as they rely on lazy textualism that must be corrected at the expense of future exploitation of a legal loophole, a point which will be addressed in the injunction section below.

This is not to mention that Defendant improperly marshals Rule 12(b)(1)'s standard in claiming the lack of an injury-in-fact in making the arguments it does. To avoid needless fiddle-faddle, the Plaintiff has provided a declaration and authenticated transcript of the recording of the illegal call at issue. But the Plaintiff is not required to do even that. The Plaintiff has plausibly alleged that the prerecorded calls at issue began with a prerecorded voice. At the pleadings stage, that is enough. The Third Circuit has rejected similar arguments that attempt to

couch factual disputes as jurisdictional challenges. "While that argument has some superficial appeal, it is wrong. [Defendant's] argument is better understood as a well-disguised challenge to the legal merits of [Plainitff's] case, not as a challenge to his standing to pursue it." *Davis v. Wells Fargo*, 824 F.3d 333, 347 (3d Cir. 2016). This Court can therefore dispense with the Defendant's prerecorded voice "initiation" argument in any way it decides to slice it.

C.    *Mr. Shelton unquestionably has standing under the TCPA.*

Equally meritless is Defendant's argument that Mr. Shelton's complaint should be dismissed for lack of an injury-in-fact, and thus a purported lack of Article III standing, for the same reason that Melody Stoops lost at summary judgment in *Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782 (W.D. Pa. 2016). Defendant would have the Court believe that *Stoops*— which predates the litany of subsequent rulings clarifying not only its limited usefulness but also cases *specifically addressing Mr. Shelton's very own standing*—stands for the proposition: "no standing for repeat TCPA litigant." Of course it doesn't. The facts of *Stoops*, the single case depriving a TCPA plaintiff of Article III standing based on the proven factual lack of an actual, pled injury in fact, and even then, only at summary judgment, are as follows:

Ms. Stoops "purchased at least thirty-five cell phones and cell phone numbers with prepaid minutes for the purpose of filing lawsuits under the Telephone Consumer Protection Act." *Id.* at 788. She "collected a shoe box full of cell phones to fish for accidental wrong number calls." *Id.* at 796. Finally, she admitted that she specifically bought those cell phones "in order to manufacture" a TCPA lawsuit and admitted that "It's my business. It's what I do." *Id.* at 799. Mr. Shelton isn't alleged to have done any of that. And, most importantly, this Court has explicitly held that Mr. Shelton *does* have standing in the face of a nearly identical challenge.

The Defendant can't point to *a single case* in which Mr. Shelton was deprived of Article

III standing to bring claims against the TCPA. That's because none exist. (Shelton Dec. ¶ 26).

*FCS Capital* did not, because that was a suit against Mr. Shelton for allegedly operating a TCPA

racketeering enterprise, and not a TCPA claim brought by him. This Court dismissed that lawsuit

against Mr. Shelton with prejudice. And more to the point, *this very Court* previously explicitly

held that Mr. Shelton had standing and rejected nearly identical arguments to those that the

Defendant proffers here, that running a judgment collection business and playing along with

callers who call him somehow deprive him of standing. As this Court explained in *Shelton v.*

*Nat'l Gas & Elec., LLC*, No. CV 17-4063, 2019 WL 1506378, at *4 (E.D. Pa. Apr. 5, 2019):

> Defendant argues that Plaintiff cannot demonstrate an injury-in-fact because he operates
> a professional judgment recovery business and "a TCPA litigation operation" in which he
> files TCPA lawsuits either to generate profit or punish telemarketers. . . . Even if this
> Court were bound by the decision in *Stoops*, neither the facts nor the procedural posture
> of this case mirror it. First, the court in *Stoops* was deciding a motion for summary
> judgment and, thus, had the benefit of discovery to support its decision. Here, we are
> dealing with a Motion to Dismiss [in a factual challenge under Rule 12(b)(1)] in which
> we have a limited amount of evidence to consider. Most importantly, Defendant has not
> introduced any evidence that Plaintiff's phone is used solely for business purposes or
> "specifically to drum up litigation." . . . In addition, the fact that Plaintiff warns
> telemarketers on his website that he will sue them if they violate the TCPA does not raise
> an inference that he "hopes for and encourages" potential defendants, acquires phones to
> increase his chances of receiving calls, or is doing anything other than exercising his
> rights. The fact that he "play[s] along" with telemarketing scripts to "find out who [they]
> really are" is not as devious as Defendant suggests. A plaintiff must know the name of
> the telemarketer that violated the TCPA in order to bring suit against it, and the content
> of the message can help prove that it was a solicitation.

The fact that this very court has previously rejected an identical argument with respect to

Mr. Shelton should be the end of the matter, particularly as the Defendant cites to no additional

evidence showing that the Plaintiff uses his cell phone solely for business purposes or to drum up

litigation, as did Ms. Stoops or Mr. Leyse. Defendant's motion is heavy on the law but light on

specific facts. Even so, this case is nothing like *Leyse v. Bank of Am. Nat'l Ass'n*, 856 F. App'x

408, 411 (3d Cir. 2021), where a plaintiff worked as a self-described "investigator" for a TCPA

attorney, called a number back more than twenty times, "used a false name, withheld the true

purpose of the calls, and secretly recorded them." *Id.* at 409. "When twice asked by DialAmerica

representatives if he wanted to be added to their Do-Not-Call list, Leyse declined." *Id.*

It is little wonder that practically every court to consider *Leyse* has clarified it and held

that pleading that the calls were unwanted and caused annoyance and frustration, just as Plaintiff

does here, are sufficient. "To trigger the Court's subject matter jurisdiction, the phone call must

constitute a "concrete" injury. . . . It does. . . .  If anything, speaking with an unwanted caller (as

alleged here) represents a more "concrete" injury than picking up an unwanted voice mail."

*Doyle v. Matrix Warranty Sols., Inc.*, 679 F. Supp. 3d 42, 43 (D.N.J. 2023) (distinguishing *Leyse*

and citing to *Susinno*, infra); *Deleo v. Nat'l Republican Senatorial Comm.*, No.

221CV03807BRMESK, 2021 WL 5083831, at *5 (D.N.J. Nov. 1, 2021) ("The mere fact Deleo

alleges he received unsolicited and intrusive text messages is sufficient to establish a concrete

harm that Congress identified and sought to redress with the TCPA.").

As the Third Circuit held in *Leyse*, "[T]he TCPA is intended to prevent harm stemming

from nuisance, invasions of privacy, and other such injuries. Therefore, Leyse must allege one of

those injuries that the TCPA is intended to prevent. The District Court found that Leyse did not

assert such an injury." *Leyse*, 856 F. App'x 408, 411 (3d Cir. 2021). Mr. Shelton plainly alleges

the exact injuries here that Leyse didn't. (Compl. ¶ 40, 48). As noted above, other courts to

consider the matter have found such pleading sufficient, including because answering a call and

playing along with a caller actually results in *more harm*, not less. *Doyle*, 679 F. Supp. 3d at 43.

And reviewing the Third Circuit's previous holding in *Leyse* further clarifies matters. The

Third Circuit, unremarkably, held that "[s]omeone with a generalized interest in punishing

telemarketers ... would not qualify *on that basis alone*" for constitutional standing. *Leyse v. Bank*

*of Am. Nat. Ass'n*, 804 F.3d 316, 323 (3d Cir. 2015). But Mr. Shelton, unlike Mr. Leyse, is not

attempting to qualify for statutory standing *solely* because he has an interest in curbing unlawful

telemarketing. Rather, he qualifies because he received unwanted calls, which the Third Circuit

has already held is sufficient. *Susinno v. Work Out World Inc.*, 862 F.3d 346 (3d Cir. 2017).

In *Susinno*, the Third Circuit heard an appeal from a TCPA claim's dismissal. The

defendant placed an unanswered call to the plaintiff, the plaintiff made no do not call request,

and the plaintiff had not been charged. *Id.* at 348. Still, the Third Circuit reversed, holding:

> Traditionally, a plaintiff's privacy is invaded for the purpose of an intrusion upon
> seclusion claim by telephone calls only when such calls are repeated with such
> persistence and frequency as to amount to hounding. The Second Restatement suggests
> that because two or three calls would not be highly offensive to the ordinary reasonable
> person, they traditionally would provide no cause of action. Yet when Congress found
> that unsolicited telemarketing phone calls or text messages, by their nature, invade the
> privacy and disturb the solitude of their recipients, it sought to protect the same interests
> implicated in the traditional common law cause of action. Put differently, Congress was
> not inventing a new theory of injury when it enacted the TCPA. Rather, it elevated a
> harm that, while previously inadequate in law, was of the same character of previously
> existing legally cognizable injuries. *Spokeo* addressed, and approved, such a choice by
> Congress.
>
> For these reasons, we hold that Susinno has alleged a concrete, albeit intangible, harm
> under the Supreme Court's decision in *Spokeo* . . . . Courts benefit from straightforward
> rules under which they can readily assure themselves of their power to hear a case. Our
> opinion today repeats our understanding that the *Spokeo* Court meant to reiterate
> traditional notions of standing. And the traditional notion of standing requires only that
> claimant allege some specific, identifiable trifle of injury. . . . Consistent with this legal
> standard, we hold that the TCPA provides Susinno with a cause of action, and that her
> injury satisfies the concreteness requirement for constitutional standing. Accordingly, we
> will vacate the District Court's order dismissing her case. . . .

*Id.* at 351-52 (cleaned up). Ignoring *Susino*, its progeny, this Court's holding in *Nat'l*

*Gas*, and the plain language of the statute, Defendant posits a unique theory of standing. It

apparently has no objection to the standing of individuals who cannot be put to the trouble of

suing them, but those like Mr. Shelton, who have a track record of investing time and energy to

enforce federal telemarketing law for the benefit of a class and the general public, according to

Defendant, should be stripped of the TCPA's protections because such conduct supposedly amounts to ongoing abuse of the federal courts and amounts to a self-described TCPA litigation "business." But there is nothing abusive or untoward about the Plaintiff investigating those who called him in violation of the TCPA. *Nat'l. Gas*, 2019 WL 1506378, at *4.

Defendant ignores that courts routinely brush aside the perverse notion that one who has been the victim of several different companies' illegal prerecorded calls may not bring several different suits. *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 954 (7th Cir. 2006) (Easterbrook, J.) ("What the district judge did not explain, though, is why 'professional' is a dirty word. It implies experience, if not expertise. The district judge did not cite a single decision supporting the proposition that someone whose rights have been violated by 50 different persons may sue only a subset of the offenders."); *Cunningham*, 251 F. Supp. 3d at 1195 (M.D. Tenn. 2017) ("Nothing in the Constitution, though, requires a plaintiff to be a naïf. Litigation is not college athletics: there is no 'amateurs only' rule."); *Martin v. Bureau of Collection Recovery*, No. 10 C 7725, 2011 WL 2311869, at *4 (N.D. Ill. June 13, 2011) ("Characterizing Plaintiff as a 'professional plaintiff' does not boost [the defendant's] argument in this discovery motion or any arguments in response to Plaintiff's motion for class certification.").

To this end, Defendant's statement (citing no one) that "if one plaintiff's injury is another plaintiff's ecstasy, only one of them has standing to sue" (Br. at p. 13), is directly at odds with the court's holding in *Cunningham*. "It may be that Cunningham was not saddened or annoyed by the calls he received. . . . But allowing that fact, even if true, to negate his right to privacy and seclusion would . . . undermine the rights of most, if not all, TCPA plaintiffs." *Cunningham*, 251 F. Supp. 3d at 1196. Even if a victim of illegal robocalls subjectively considered the statutory damages from a given call to outweigh his injuries from that call, his standing would not be

diminished. Congress was well aware of this possibility when it passed the TCPA, and no general rule requires plaintiffs who prove their cases to end up worse off than before the defendant injured them.

As this Court has already held, Mr. Shelton unquestionably has standing because he received an illegal prerecorded call which violated the TCPA and resulted in the violations of privacy, and "occupation of telephone lines, storage space, and bandwidth, rendering them unavailable for legitimate communication, including while driving, working, and performing other critical tasks" that the statute was designed to protect against. Nothing has changed since this Court held in *Nat'l. Gas* that Mr. Shelton had standing. Defendant points to no new evidence that should change this Court's conclusion. As a result, Mr. Shelton has suffered a cognizable injury-in-fact as a result of his receipt of the illegal prerecorded call at issue.

### D. Plaintiff's treble damages and injunctive relief claims also survive because Plaintiff has pled that the TCPA was violated wilfully and because Defendant has identified a potential legal loophole it has announced that it intends to use to send the illegal calls.

Defendant also moves on interrelated grounds under Rule 12(b)(6) to dismiss the Plaintiff's claims for injunctive relief and treble damages under the TCPA. Specifically, Defendant argues Plaintiff has not pled facts that would warrant a finding of "knowingness" or "wilfulness" such as to justify the imposition of treble damages under the TCPA. And with respect to injunctive relief, the Defendant seizes on a typo in the Plaintiff's complaint to assert that the injunctive relief requested is allegedly "frivolous."

Start with the appropriateness of treble damages. Of relevance here, the TCPA's robocall prohibition, 47 U.S.C. § 227(b)(3), permits the Court to award up to treble damages "[i]f the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection." The Plaintiff has pled facts in his complaint that give rise to

the plausible inference that Defendant knowingly used such illegal prerecorded voice robocalls to send the call complained of. Accordingly, the Defendant's motion on this point must fail.

As recently as last month, a District Court clarified the requisite legal standard for a Defendant to have "knowingly" violated the TCPA. In *Koeller v. Seemplicity Security Inc.*, No. 4:24-CV-00528-SRC, 2024 WL 4751306, at *4 (E.D. Mo. Nov. 12, 2024) (cleaned up), the Court explained, with respect to related Do Not Call Registry claims under the TCPA:

> Under the plain text of section 227(c)(5), two types of violations may entitle a plaintiff to damages amounting to three times the set statutory damages: knowing violations and willful violations. . . . The Court therefore begins by considering the ordinary meaning of the adverbs "knowingly" and "willfully." . . . . "[K]nowingly" ordinarily means "[i]n a knowing manner" or "with knowledge," i.e., "intelligently, consciously, intentionally, etc."

> The proper interpretation of section 227(c)(5) therefore turns on how a defendant knowingly "initiated any telephone [call]" . . . When read into section 64.1200(c)(2), "knowingly" and "willfully" modify a transitive verb—"initiated." Ordinarily, a listener assumes that an adverb that modifies a transitive verb "tells the listener how the subject performed the entire action." *Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009). For example, "if a bank official says, 'Smith knowingly transferred the funds to his brother's account,' " listeners "would normally understand the bank official's statement as telling [them] that Smith knew the account was his brother's." *Id.* . . .

> So too in the context of section 227(c)(5) and section 64.1200(c)(2). There, a listener would ordinarily understand, for example, that knowingly "initiated any telephone solicitation" . . . means that a person knew that he initiated a telephone solicitation and knew that he was calling a residential telephone subscriber who had registered his or her telephone number on the national do-not-call registry.

Although the Court in *Koeller* dealt with "knowingly" as it pertains to knowing that the caller was "calling a residential telephone subscriber who had registered his or her telephone number on the national do-not-call registry," its reasoning proves illustrative in this context when interpreting the violations here, for placing calls with a prerecorded voice. It would be difficult to conceive of a situation where a caller does *not* "know" that they were sending a call with a prerecorded voice. A listener uttering the phrase, "knowingly made a call using an artificial or

prerecorded voice," *cf.* 47 U.S.C. § 227(b)(1)(A), would ordinarily understand that the person knew that he made a call and knew that he was doing so using an artificial or prerecorded voice.

Neither *Arcieri* nor *Zelma* dictate a contrary result. Both of those cases dealt with section 227(c) violations for calling a number on the Do Not Call Registry. In *Arcieri*, the court held that the plaintiff did not make an adequate showing that the defendant "knew or acted in reckless disregard as to whether the plaintiff's telephone number was registered on the [Do Not Call Registry]," and so dismissed that claim *without prejudice*. *Arcieri v. Suntuity Solar Ltd. Liab. Co.*, No. 20-16292 (FLW), 2021 U.S. Dist. LEXIS 186205, at *27 (D.N.J. Sep. 27, 2021). Not so here, where it is hardly conceivable that the Defendant did not know that it was making calls *using a prerecorded voice*. And in *Zelma*, the court dismissed the entire case when the plaintiff failed to rebut the defendant's assertion that the plaintiff had an "established business relationship" with a magazine who was calling to solicit a subscription renewal. *Zelma v. Art Conway*, No. 2:12-CV-00256 DMC, 2013 WL 6498548, at *2 (D.N.J. Dec. 11, 2013). It goes without saying that a magazine thinking it was calling one of its subscribers to solicit a renewal hardly acted "knowingly" or with "reckless disregard" of whether a number was on the Do Not Call Registry. To the contrary, it demonstrates the opposite: it was only calling those people with whom it already had a relationship, and not knowingly cold calling people.

"The normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning." *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986). So it follows—as courts throughout the country have held—that a plaintiff adequately states a claim for trebled damages under the TCPA's *robocall provisions* where the complaint alleges that a defendant consciously and deliberately delivered the prerecorded voice messages at issue, even if the defendant did not specifically intend to violate the TCPA. *See, e.g.*,

*Lemieux v. AT&T*, No. 10cv0982 JAH (WMc), 2011 WL 13356092, at *4 (S.D. Cal. May 13, 2011) ("This Court finds these decisions persuasive and determines that a willful and knowing violation is the knowledge that a prerecorded audio was used to communicate to another party."); *Davis v. Diversifield Consultants, Inc.*, 36 F. Supp. 3d 217, 226 (D. Mass. 2014) ("While neither the TCPA nor FCC regulations provide a definition for willful and knowing, most courts have interpreted the willful or knowing standard to require only that a party's actions were intentional, not that it was aware that it was violating the statute.").

Nothing more is required of the Plaintiff at the pleading stage. *See, e.g.*, *Pacleb v. Cops Monitoring*, No. 2:14-CV-01366-CAS (JCx), 2014 WL 3101426, at *1, 4 (C.D. Cal. July 7, 2014) (holding wrong number automated calls was sufficient to state a claim for treble damages)*; Keifer v. HOSOPO Corp.*, No. 18-cv-1353-CAB, 2018 WL 5295011, at *5 (S.D. Cal. Oct. 25, 2018) (finding an allegation that plaintiff never provided his information to the defendant sufficient to state a claim for treble damages); *Meyer v. Bebe Stores, Inc.*, No. 14-cv-00267-YGR, 2015 WL 431148, at *4 (N.D. Cal. Feb. 2, 2015) (finding allegations that "defendant, using an ADTS [sic], sent text message to plaintiff in knowing and/or willful violation of the TCPA" sufficient to state a claim for treble damages).

To accept Defendant's motion and dismiss the Plaintiff's demand for treble damages at the pleadings stage would necessarily require the Court to make a holding that the Plaintiff has not plausibly alleged that the Defendant *knew* that it was using a "prerecorded voice" "to make any call" as the statute requires. But this inference is eminently logical, and the Defendant's counterproposition is illogical. In other words, the contrary holding, that the Defendant *did not know* that it was using an "artificial or prerecorded voice" is simply illogical when one considers the Plaintiff's facts as pled, especially in light of the Defendant's own motion. It defies logic and

common sense to argue that a sophisticated scam PAC like Defendant would "unknowingly" hire

a professional ruffian voice actor to create a prerecorded call, load that recording into a dialer,

and then mass dial people with that recording. Those contrary inferences are rendered all the

more unlikely when one considers the Plaintiff's further pleadings, namely that he was

transferred by the robot to a human being who took down the Plaintiff's information. (Compl. ¶

31). One would expect that a human being unknowingly receiving a call transfer from a

prerecorded voice would question why they are receiving such a call transfer from a robot.

Because the Plaintiff has pled facts which show that the Defendant acted "knowingly,"

and because one can hardly conceive of a situation where an entity like the Defendant does not

send prerecorded calls "unknowingly," this portion of the motion also ought to be denied.

And, in yet another example of the pot calling the kettle black, the Defendant appears to

have "said the quiet part out loud" and admitted that it will continue to illegally call Mr.

Shelton's and other class members' cell phones in the absence of an injunction using highly

illegal prerecorded messages, so long as it does not "initiate" a call using a prerecorded voice.

(Br. at 14, 9–10). It does not deny that fact but instead seizes on a typo in the Prayer for Relief in

Plaintiff's complaint seeking an injunction for violations of the Do Not Call Registry to ensure

its plan faces no opposition. For the avoidance of doubt, Plaintiff here clarifies the typo in that

section and the injunctive relief he is seeking: an injunction prohibiting the Defendant from using

a prerecorded voice to contact cell phones in the future. Plaintiff has stated the correct relief

elsewhere in his Complaint, which requests an injunction "prohibiting Defendant . . . from

making pre-recorded calls,. . . to any protected telephone number in the future." (Compl. ¶ 60).

This Court must further recognize that the Defendant seems to insinuate, in its very own

motion and by its very own admission, that it will continue to place illegal calls making a

prerecorded voice: it just won't "initiate" them with such voices. Although the Plaintiff contends that the law is not written in such a way that would permit the exploitation of such a loophole as the Defendant suggests, the Defendant bragadocuously talks about how it will continue to violate the TCPA "like a want-to-be mafioso." (Br. at 6). This is so because the Defendant's very own business model relies on sending illegal prerecorded calls to cell phones and tricking the recipients into thinking that their donations are going to support police officers, when, in reality, the vast majority of the money goes to paying for "professional fundraising," i.e. illegal prerecorded robocalling, expenses. *See United States v. Zeitlin*, No. 23-CR-0419 (LAK), 2024 WL 3429506, at *1 (S.D.N.Y. July 15, 2024) (describing similar criminal case, also defended by Defendant's law firm, where defendant Zeitlin pled guilty to multiple felonies for providing misleading and false information about how the donors' money would be spent and the nature of the organizations to which they were giving).

Nothing can punch holes in the Defendant's meal ticket more effectively than an injunction prohibiting the Defendant from using illegal prerecorded calls in its fundraising efforts. Because no legitimate charity relies on non-compliant prerecorded calls, the business of sending illegal prerecorded robocalls has largely dried up and been exploited by bad actors, like the Defendant, who simply ignore the law. Accordingly, this Court should permit the Plaintiff's request for injunctive relief to stand and revise the typo accordingly, as the Plaintiff's allegations plainly establish a risk of future injury for prerecorded calls to his cell phone.

## V.   CONCLUSION

This Court must deny Defendant's motion to dismiss in its entirety. Alternatively, to the extent that the Court finds that additional questions remain, it should permit the Plaintiff to amend to correct the deficiencies as necessary.

Dated: December 26, 2024

*/s/ Andrew Roman Perrong*
Andrew Roman Perrong, Esq.
Perrong Law LLC
2657 Mount Carmel Avenue
Glenside, Pennsylvania 19038
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing via ECF on the below date, which will automatically send a copy to all attorneys of record on the case.

December 26, 2024

*/s/ Andrew Roman Perrong*
Andrew Roman Perrong, Esq.
Perrong Law LLC
2657 Mount Carmel Avenue
Glenside, Pennsylvania 19038
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com